# IMPORTANT NOTICE

# "NOT TO BE PUBLISHED OPINION"

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED" PURSUANT TO RULE OF APPELLATE PROCEDURE (RAP) 40(D). THIS OPINION SHALL NOT BE CITED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE.

UNDER RAP 41, UNPUBLISHED OPINIONS OF KENTUCKY APPELLATE COURTS RENDERED AFTER JANUARY 1, 2003, THAT ARE FINAL UNDER RAP 40(G), MAY BE CITED BY A PARTY FOR CONSIDERATION BY A COURT IF THERE IS NO PUBLISHED OPINION THAT ADEQUATELY ADDRESSES THE POINT OF LAW BEING ARGUED BY A PARTY.

IF AN UNPUBLISHED OPINION IS CITED FOR CONSIDERATION BY A COURT THE OPINION SHALL BE SET OUT AS AN UNPUBLISHED OPINION IN THE DOCUMENT IN WHICH THE UNPUBLISHED OPINION IS CITED.

RENDERED: APRIL 23, 2026
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0499-MR

CHRISTOPHER GORDON            APPELLANT

V.        ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE TRACY E. DAVIS, JUDGE
NO. 22-CR-000711

COMMONWEALTH OF KENTUCKY            APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

A Jefferson County jury found Christopher Gordon guilty of murder, assault in the first degree, felon in possession of a handgun, and being a first-degree persistent felony offender for shooting and killing Angelica James and shooting her ten-year-old son in the hand. Gordon was sentenced to life in prison. Gordon appeals as a matter of right. After careful review, we affirm.

## BACKGROUND

Gordon and Angelica James were in a romantic relationship and had a two-year-old son, C.G. Angelica has three older sons who are unrelated to Gordon: Daejon (22), Martrell (18), and J.H. (10).

Daejon lived at 4102 Quiet Way with his girlfriend, her brother, their mother, and their grandmother. The night before the shooting, Martrell stayed

with Daejon. On the morning of February 27, 2022, Angelica contacted Daejon and Martrell to ask if they wanted to go to Malibu Jacks with her and their younger siblings. Martrell decided to go, but Daejon did not. Angelica also invited Gordon.

Martrell testified that Angelica picked him up at Quiet Way with J.H. and C.G. in the car and took them to Malibu Jacks. Gordon met them at Malibu Jacks. While there, Daejon called Angelica from his new phone number. It was unclear to Gordon who called Angelica because she had not yet saved Daejon's new number in her phone. Martrell believed this caused friction between Gordon and Angelica because Gordon assumed she was cheating.

The group left Malibu Jacks around 2:35 p.m. Martrell and J.H. left with Angelica, but C.G. left with Gordon. Angelica picked up Daejon, and the four of them went to Walmart. While there, Gordon called Angelica, claiming C.G. fell and injured his hand. Angelica and Gordon began arguing, and Angelica told Gordon to bring C.G. back to her. Daejon testified that they later learned that C.G. was not injured.

Upon returning to Quiet Way, Daejon and Martrell went inside the house, but Angelica and J.H. stayed in the car waiting for Gordon to bring C.G. back. Angelica's car was parked directly in front of the house with the driver's side facing the porch. When Gordon arrived, he pulled parallel to Angelica's car and stopped in the middle of the street.

Daejon testified that he was inside the house with his girlfriend's brother, Lazarus Vance, when Daejon heard yelling. Upon looking out the window,

2

Daejon saw Gordon standing outside the passenger door of Angelica's car, shooting Angelica, who was inside the car. Daejon and Lazarus exited the house and began shooting at Gordon. Daejon initially shot from the driveway, and Lazarus shot from the porch. Lazarus briefly went back inside and then went to shoot at Gordon further down the road. Gordon returned fire.

Daejon recalled firing six shots. He said he owned the gun but could not remember the caliber or brand. He knew that Martrell had a .380 that broke apart, but he claimed he did not give it to him. He also testified that Lazarus shot a 9mm Ruger.

Gordon fled, and Daejon and Lazarus continued shooting at his truck. Gordon struck a parked van, pushing it into a ditch. Then, he drove away. Daejon told Lazarus to stop shooting because he remembered C.G. was in the truck with Gordon.

Daejon went to Angelica, his mother, and asked her to get out of the car, but she fell out. He held his mother as she took her last breath. J.H. was still in the car and had a gunshot wound to his hand. J.H. rolled the window down to tell Daejon that Gordon was running. Someone else helped J.H. with his injury.

Martrell testified that he was inside the house with Daejon and Lazarus when they heard several gunshots. Daejon went outside, and Martrell looked out the window, trying to decide what to do. He went outside when the gunshots stopped and saw their mom falling out of the car. Martrell testified

3

that someone handed him a gun. However, the gun had broken apart into pieces, so he just put it on the ground.

Lazarus lived at the Quiet Way house with his grandmother, mom, and sister, and said he did not know if Daejon lived there. Lazarus knew Angelica because she was Daejon's mother, and their mothers might also have been friends. On the day of the shooting, Lazarus testified that he was inside the house making food when he heard the first round of shots. Lazarus heard Daejon and Martrell say their mom had been shot. When Lazarus heard gunfire, he ran outside to return gunfire in defense of his house. Lazarus did not know Gordon, but he saw a man standing by Angelica's car door and a truck. Lazarus shot at the man as he tried to get into the truck. Lazarus went outside first, and Daejon came out after him. He testified that they never shot at Angelica's car, and he shot at the truck because he heard gunshots, saw the man with a gun, and saw Angelica falling out of her car.

Lazarus testified that he fired a 9mm Ruger belonging to his mother, Jeremika Vance. He did not remember whether Daejon and Martrell had guns or whether there were any others. He said he fired fifteen rounds from the front porch and about fifteen more when he moved down the driveway. He recalled telling police that his mother tried to help Angelica.

On cross-examination, Gordon impeached Daejon, Martrell, and Lazarus, asking them if they remembered originally telling the police that none of them fired any weapons. Defense counsel showed each of them a transcript of prior inconsistent statements, and they did not recall making them.

4

However, their trial testimony was largely corroborated by other witness testimony. Jeremika testified that she lived at the Quiet Way house with her mother, Lazarus, her daughter, and Daejon. Jeremika and Angelica became friends because Lazarus and Martrell played football together, and Daejon dated her daughter. Jeremika knew Gordon by sight and knew he had a romantic relationship with Angelica, but she had not met him.

Jeremika testified that she was home on the day of the shooting. She, her mom, and her grandson came home from church and lay down to take a nap.  A few minutes later, Angelica dropped Daejon and Martrell off at her house. Then, she heard gunshots and Daejon and Martrell yelling that their mom had been shot. She ran to the door and stood behind Daejon and Lazarus. She saw Gordon running, and when he saw Daejon and Lazarus at the door, he shot at Daejon and Lazarus. They ran back inside, and Lazarus grabbed Jeremika's gun out of her purse. Lazarus and Daejon returned fire to defend themselves. During the shooting, she saw Angelica falling out of her car. Jeremika got Angelica on the ground and started CPR to try to save her. An officer helped her perform CPR until the paramedics arrived.

Douglas Miller lived directly across the street from the Quiet Way house. He and his wife had lived there for thirty-five years. Miller knew the family, but knew Lazarus best. Miller testified that Lazarus was like a son to him when he was growing up and that he hung out with his grandkids when they were younger. More recently, Miller had not interacted much with the family.

Miller and his wife were home during the shooting. Miller was watching TV when he looked out an open window and saw Angelica's car parked in front of the house across the street. He saw a maroon truck with blacked-out windows pull up in the middle of the street beside Angelica's car, which blocked his view. Miller said that got his attention because cars had to pull into his yard to get around the truck. Miller went out on the porch to see what was going on and went back inside. Then, he heard three gunshots and saw Lazarus and Daejon come outside and shoot at the truck. The truck took off, hit a parked van, and kept going. Lazarus and Daejon shot until they ran out of bullets, and Miller heard Lazarus say he needed more bullets. He saw the "one with the missing tooth," presumably Daejon, throw his gun on the ground, which caused it to break apart. A few stray bullets struck his house, and at least two were not recovered. However, Miller was adamant that Lazarus and Daejon shot at the truck and not his house.

Miller's wife called 911 to report gunshots. She reported that two young black males shot at a truck, and the truck struck a parked vehicle. Another 911 caller reported that a woman had been shot and was laying on the ground. The caller believed the woman's boyfriend pulled up in a maroon truck and shot her. There was audible screaming in the background of the recording, which the caller said came from the woman's children.

Detective Bradley Beckham, the lead investigator, responded to the scene on a report that a woman and a child had been shot. The other witnesses'

testimony was consistent with his description of the scene. J.H. had been shot in the hand and provided the suspect's name.

Detective Beckham further testified about the investigation, including the ballistics examination of Angelica's car and Gordon's truck. The bullet holes in Angelica's car all came from a .40 caliber gun, and they all entered through the passenger side and exited through the driver's side. Detectives recovered four .40 caliber bullet casings from her car. The first was found by the gear shift, the second was in the passenger seat, the third was tucked into the fold of the front passenger seat, and the fourth was in the front passenger floorboard. Two more were found outside the car: one near the back passenger-side tire and one outside the driver's side door where Angelica fell. The locations were consistent with Gordon shooting at Angelica and J.H. from the passenger side of her car. The bullet holes in Gordon's truck showed that bullets had entered from the outside of the driver's side of the truck. No casings were recovered from the truck. There was damage to the front passenger side from hitting the parked van, and the truck's windows were darkly tinted.

Detective Beckham testified he believed all the 9mm casings came from the gun(s) fired by Lazarus. Detective Joseph Dudzinski testified that nine casings from a 9mm gun were found in front of Angelica's car, in the street near the end of the driveway, around the front door of the house, on the front porch, and in the yard. Detective Dudzinski believed the three .380 casings recovered, which were found just off the driveway in the yard near a ditch,

came from the gun Daejon fired. More .40 caliber casings were found further up the street from Angelica's car on the left side of the road near some grass.

Dr. Donna Stewart, medical examiner and forensic pathologist, performed Angelica's autopsy. Dr. Stewart confirmed that Angelica died from multiple gunshot wounds. Dr. Stewart described ten individual entry wounds while showing the jury photos of each one and marking them on a mannequin. She opined which of the ten entry wounds could have been reentry wounds. The Commonwealth showed photographs of Angelica's body with trajectory rods, which Dr. Stewart used to determine possible reentry wounds. Dr. Stewart testified that the blood on Angelica's sweatshirt was primarily on the right side.

Gordon did not testify, but three of his sisters testified on his behalf. After leaving Malibu Jacks, Gordon and C.G. went to Gordon's mother's house for a birthday party cookout. His sister, Shamika Woods, testified that the landline rang, and she answered it. Angelica asked to talk to Gordon because she wanted Gordon to bring C.G. back to her. Woods went outside to tell Gordon, who was playing football with the children at the cookout, and he said to have Angelica call him on his cellphone. Woods testified that Gordon did not seem upset, angry, or jealous and was having a good time. Gordon then left to take C.G. to Angelica.

Later, Gordon called his oldest sister. Then, Woods, the other sister, and their mother went to the oldest sister's house. Woods testified that Gordon was shaken up and worried about whether he and C.G. had been shot. Once they

8

determined neither had been shot, they went back to their mother's house. Gordon left C.G. with his mother and sisters.

Woods did not know what Gordon had done earlier in the day. She did not know about any other calls he made that day, but she knew he was driving a red truck. None of them, including Gordon, ever called 911 or contacted law enforcement to say that anyone set him up to try to kill him. Testimony from Gordon's two other sisters was mostly consistent with Woods's.

After an eight-day trial, the jury found Gordon guilty of murder and first-degree assault. In a trifurcated proceeding, the jury found Gordon guilty of felon in possession of a handgun and being a persistent felony offender in the first degree. Prior to sentencing, Gordon moved for a new trial, which the trial court denied. The court sentenced Gordon to life in prison. This appeal followed.

On appeal, Gordon first argues the trial court abused its discretion in excluding Angelica's recorded statement that she was going to kill him. Second, Gordon argues the trial court abused its discretion in allowing the Commonwealth to introduce his prior assault conviction where Angelica was the victim without tying it to any KRE[1] 404(b) purpose. Third, Gordon argues he was denied a reasonable opportunity to defend himself because the trial court allowed the medical examiner to testify about an undisclosed premise not

---

[1] Kentucky Rules of Evidence.

readily deducible from her report. Finally, Gordon argues the trial court violated his right to due process by failing to remove Juror 37 for cause.

## **STANDARD OF REVIEW**

We review evidentiary issues for an abuse of discretion, *Clark v. Commonwealth*, 567 S.W.3d 565, 576 (Ky. 2019), which requires this Court to consider whether the trial court's decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Meredith v. Commonwealth*, 677 S.W.3d 452, 456 (Ky. 2023) (quoting *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999)). We also "review a trial court's decision to strike or not strike a juror for cause under an abuse of discretion standard." *Moulder v. Commonwealth*, 681 S.W.3d 49, 52 (Ky. 2023).

## **ANALYSIS**

### I.  **The trial court did not abuse its discretion in excluding Angelica's recorded statement.**

First, Gordon argues the trial court abused its discretion in excluding Angelica's recorded statement that she was going to kill him. He asserts the statement was admissible under the state-of-mind exception under KRE 803(b). At trial, Gordon's defense theory was that Angelica lured him to the house, so Daejon and Lazarus could ambush and kill him. He alleged the purported ambush stemmed from a past altercation between Daejon and Gordon.

Twenty-six days before Angelica was killed, Gordon and Daejon had an altercation over marijuana, and Gordon knocked out one of Daejon's teeth.

10

Police arrived at the scene to take a report of the assault. One officer wore a bodycam, which recorded Angelica telling the officer she was angry about what Gordon had done and that if he ever came over again, she would kill him. Daejon was present when Angelica made the statement.

At trial, Gordon sought to introduce Angelica's statement that she would kill him through Daejon's testimony. Gordon argued Angelica's statement was admissible to impeach Daejon, to show Angelica's future intent, or was an excited utterance. First, Gordon argued the statement was admissible to impeach Daejon because Daejon testified that he did not recall the prior altercation. Second, Gordon argued Angelica's statement demonstrated her state of mind on the day she was killed. The Commonwealth and Gordon disputed who initiated the meeting on the day of the shooting. The Commonwealth contended that Gordon called Angelica after they left Malibu Jacks claiming C.G. hurt his hand. The defense believed Angelica's recorded statement supported its theory that Angelica called Gordon and asked him to bring their son to the house to set him up for an ambush. The defense argued the statement went to the heart of Gordon's defense because it demonstrated Angelica's intent to kill Gordon on the day she was killed.

The trial court noted that Angelica was clearly upset when she made the statement after Gordon assaulted Daejon. The court permitted Gordon to call the officer to establish that the altercation happened for impeachment purposes, but ruled Angelica's specific statement was inadmissible. The court reasoned that it was irrelevant to impeaching Daejon's testimony about his

11

inability to recall the altercation because he did not make or adopt Angelica's statement.

Additionally, the trial court ruled the statement could not be used to show Angelica's state of mind. The court reasoned that Gordon declined a self-defense jury instruction, and there was no evidence that she was the initial aggressor or had a physical altercation with Gordon preceding the shooting. The court allowed Gordon to present the evidence by avowal.

Though Angelica's statement was excluded, Gordon elicited testimony from Daejon that supported the defense theory. The defense questioned Daejon about the prior assault, which Daejon claimed he did not remember. To refresh his memory, defense counsel showed Daejon a transcript of his statement to police on the day Gordon assaulted him. The transcript showed that Daejon said he had "the rage" and people wanted him to stay away from Gordon "because they didn't want nothing to happen." Ultimately, Gordon got to introduce evidence of the assault to impeach Daejon and the possibility that Daejon might seek revenge.

On appeal, Gordon abandons his impeachment argument and solely argues that Angelica's recorded statement was admissible under the state-of-mind hearsay exception to support his theory that Angelica asked Gordon to come to the house to ambush him. KRE 803(3) admits hearsay that demonstrates a "statement of the declarant's then existing state of mind . . . such as intent, plan, [or] motive." "[T]he crucial component of" the state of mind exception is "contemporaneity of declarant's state of mind and the

12

statement describing it, meaning that the exception" leaves "no room for the use of a statement describing a state of mind that existed at some earlier point in time." Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 8.50[2][a] (2025); *Sturgeon v. Commonwealth*, 521 S.W.3d 189, 198 (Ky. 2017). Though "the statement cannot solely concern past information," it may be admitted if it "cast[s] light upon her future intentions." *Rucker v. Commonwealth*, 521 S.W.3d 562, 571 (Ky. 2017) (quoting *Ernst v. Commonwealth*, 160 S.W.3d 744, 753 (Ky. 2005)).

An "out-of-court statement that fits within the state of mind exception must still meet the relevancy provisions of KRE 401-403." *Sturgeon*, 521 S.W.3d at 198. A statement cannot "be admitted into evidence" when "the victim's state of mind is not at issue." *Id.* (quoting *Bray v. Commonwealth*, 68 S.W.3d 375, 381 (Ky. 2002)). Typically, "a victim's state of mind may be at issue and thus relevant where the defendant claims self-defense, an accidental death, or suicide." *Martin v. Commonwealth*, 686 S.W.3d 77, 91 (Ky. 2023) (internal quotation marks omitted). For example, a statement conveying the victim's state of mind may be relevant when a defendant claims self-defense, there is evidence that the victim attempted to ambush and kill the defendant, and it is unclear whether the victim or defendant was the initial aggressor. *Rogers v. Commonwealth*, 60 S.W.3d 555, 556 (Ky. 2001). "Even an uncommunicated threat by the deceased against the defendant is admissible to show the deceased's state of mind prior to the killing and as evidence to prove

13

who was the aggressor." *Brock v. Commonwealth*, 947 S.W.2d 24, 29 (Ky. 1997).

Even if we accept Gordon's argument that Angelica's statement that she would kill him was indicative of her future intent, her state of mind was not at issue. Gordon did not ask for a self-defense instruction and concedes in his appellant's brief that Angelica's statement may not have been relevant to a claim of self-defense. At trial, the defense acknowledged that Gordon was unaware of Angelica's statement that she would kill him. Though an uncommunicated statement may be indicative of future intent, Gordon points to no evidence showing Angelica was the initial aggressor or that there was any type of altercation between Gordon and Angelica preceding the shooting. For these reasons, the trial court did not abuse its discretion in excluding Angelica's statement.

Even if excluding Angelica's statement was erroneous, the error was harmless. "Ordinarily, an 'evidentiary error . . . is harmless if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error.'" *Daugherty v. Commonwealth*, 467 S.W.3d 222, 236 (Ky. 2015) (quoting *Harris v. Commonwealth,* 384 S.W.3d 117, 125 (Ky. 2012)). Though Angelica's statement was excluded, Gordon was able to show Daejon's hostility toward Gordon in support of the defense theory. The evidence of Gordon's guilt was overwhelming, and exclusion of Angelica's statement did not substantially affect the judgment.

14

## II. The trial court did not abuse its discretion in admitting evidence of Gordon's prior assault conviction.

Gordon argues the trial court abused its discretion in allowing the Commonwealth to introduce evidence of his prior conviction for assaulting Angelica. He argues that the Commonwealth never tied it to any KRE 404(b) purpose, so it amounted to propensity evidence. After Gordon filed a motion to exclude any prior bad acts, the Commonwealth filed a KRE 404(c) notice of its intent to introduce evidence of Gordon's prior conviction for fourth-degree assault, domestic violence against Angelica.

The Commonwealth sought to introduce evidence that, in 2020, Gordon hit Angelica in the face and threw her on the ground because he thought she was cheating on him. Angelica sustained injuries to her face and had difficulty walking afterward. Angelica's minor children, J.H. and C.G., were present during the incident. Gordon entered an *Alford* plea and was placed on supervised probation. The Commonwealth asserted the evidence would show Gordon's intent, motive, and absence of mistake or accident.

The Commonwealth argued that the prior conviction showed Gordon's intent to kill Angelica and that she was not simply caught in a crossfire. Gordon objected, arguing that the fourth-degree assault was not similar to what occurred in this case, was too remote, and more prejudicial than probative. The Commonwealth responded that it was willing to introduce evidence that Gordon was convicted of fourth-degree assault and that Angelica was the victim.

15

The trial court allowed the Commonwealth to call a Jefferson Circuit Court deputy clerk to testify that Gordon had been convicted of misdemeanor fourth-degree assault, domestic violence, and that Angelica was the victim. At trial, the deputy clerk's testimony conformed to the trial court's ruling.

Prior to closing arguments, defense counsel moved to prohibit the Commonwealth from mentioning Gordon's assault on Angelica because the Commonwealth failed to link it to any KRE 404(b) purpose. Though unclear, Gordon's complaint seemed to be that the Commonwealth failed to demonstrate this link to the jury. The Commonwealth responded that the prior assault showed that Gordon had committed a similar act of domestic violence against Angelica to demonstrate Gordon's intent and motive to harm Angelica. The trial court denied Gordon's motion and allowed the Commonwealth to mention Gordon's assault on Angelica in closing. However, Gordon asserts the Commonwealth never mentioned that assault in closing, and, thus, never linked the assault on Angelica to any KRE 404(b) purpose.

KRE 404(b) provides in pertinent part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible: (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" Because "KRE 404(b) is exclusionary in nature, . . . any exceptions to the general rule that evidence of prior bad acts is inadmissible should be closely watched and strictly enforced because of [its] dangerous quality and prejudicial

16

consequences." *Driver v. Commonwealth*, 361 S.W.3d 877, 883 (Ky. 2012). A trial court may admit prior bad act evidence when it is (1) relevant, (2) probative, and (3) not unduly prejudicial. *Id.*

Generally, "prior bad acts of a similar nature committed by the defendant against the victim will usually be admissible." *Id.* at 884. However, "the rule is limited in this important respect: prior acts are not admissible when the conduct occurred too remote in time to fairly represent any reasonable application to the present crimes." *Id.* There is no "demarcation point by which remoteness is to be judged. Rather, . . . the inquiry will be left to the trial court's sound discretion depending upon the facts of the individual case." *Id.* When a defendant or victim claims that an act of violence against the victim was accidental, "the prior bad acts evidence [is] relevant and probative to showing that the injuries were not the result of an accident." *Id.*

Here, the shooting occurred about two years after the assault. However, Gordon's defense was that Daejon and/or Lazarus accidentally shot Angelica while they shot at Gordon. The assault conviction was relevant and probative to show that it was more probable that Angelica's death was not an accident. *See id.* at 885. "[B]ecause of the substantial relevance and probativeness of the evidence, admission of the prior acts did not result in undue prejudice to the Appellant." *Id.*

Furthermore, our case law does not require the Commonwealth to articulate to the jury a specific link between a prior bad act and the charges being tried. We decline Gordon's invitation to scrutinize the Commonwealth's

17

failure to link the prior bad act and Angelica's murder in its closing argument, during which it has wide latitude. The only relevant analysis is whether the trial court abused its discretion in admitting the evidence. Based on our review, admission of the prior assault was within the trial court's sound discretion.

### III. The trial court did not abuse its discretion in allowing the medical examiner to testify about possible reentry wounds.

Gordon argues the trial court abused its discretion in permitting the medical examiner, Dr. Donna Stewart, to testify about an additional undisclosed principle not readily deducible from the conclusions contained in her report. Dr. Stewart described each individual entry wound on Angelica's body, and the Commonwealth then asked her about possible reentry wounds. Dr. Stewart responded that she could only opine as to possible reentry wounds. Defense counsel objected arguing that because Dr. Stewart's report did not specifically mention the word reentry, her testimony should have been confined to ten entry wounds. Limiting her testimony to ten entry wounds would have supported the defense theory. Only six .40 caliber casings were found in and around Angelica's car, so the defense theorized that it would have left open a question of where the other four shots came from. The possibility of reentry wounds supported the Commonwealth's theory because it was more consistent with the six casings found in and around her car.

On cross-examination, defense counsel sought to discredit Dr. Stewart's reentry testimony. Although Dr. Stewart agreed that her report did not contain the word "reentry," she testified that photographs of the rods showing the

18

trajectories of the bullets and possible reentry wounds were included in her report. Counsel also asked Dr. Stewart if she recalled that when they met, he asked her about reentry wounds, and she did not think there were any. Dr. Stewart responded that she told him that there possibly could be reentry wounds. Counsel asserted, without asking a question, that there was nothing about reentry wounds until Dr. Stewart's testimony. Dr. Stewart responded that the photographs in her report showed possible reentry wounds, but she could not say for certain.

RCr[2] 7.24(1)(c) requires the Commonwealth to "furnish to the defendant a written summary of any expert testimony that the Commonwealth intends to introduce at trial. This summary must identify the witness and describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." "[A]n expert may not testify to an additional, undisclosed principle or premise not readily deducible from the conclusions contained in that expert's report. In other words," the purpose of RCr 7.24(1) is to "prevent a party from being deliberately surprised at trial." *Bowling v. Commonwealth*, 553 S.W.3d 231, 240 (Ky. 2018).

As in *Bowling*, Dr. Stewart's testimony regarding reentry wounds should have been foreseen by the defense. *See id.* Though Dr. Stewart's report did not contain the word "reentry," it included photographs of rods she used to help determine trajectories of the bullets and possible reentry wounds. Gordon's

---

[2] Kentucky Rules of Criminal Procedure.

argument that defense counsel was unaware of possible reentry testimony until Dr. Stewart testified is disingenuous and refuted by the record. On cross-examination, Dr. Stewart made clear that, when she met with defense counsel prior to trial, she informed him of the possibility of reentry wounds. Although Dr. Stewart's testimony undercut Gordon's defense theory, counsel should not have been surprised by Dr. Stewart's opinion regarding reentry wounds. Therefore, the trial court did not abuse its discretion in allowing Dr. Stewart to testify concerning possible reentry wounds.

## IV. The trial court did not abuse its discretion in denying Gordon's request to strike Juror 37 for cause.

Finally, Gordon argues the trial court violated his right to due process in failing to strike Juror 37 for cause. During voir dire, defense counsel informed the venire that the Commonwealth bore the burden of proof, and the defense was required to prove nothing. Counsel hypothesized that someone may think that if they were charged with murder, they would testify on their own behalf. Counsel asked Juror 37 if she would feel that way, and she said she probably would. Counsel stated that the defendant does not have to testify, and it cannot be held against him. Then, counsel asked Juror 37 if she had a problem with that. Juror 37 hesitated and said she would want to hear the full story.

Before individual voir dire, the trial court discussed the issue with defense counsel. The trial court stated defense counsel told the panel that the defendant that did not have to testify if he did not want to, not specifically that the defendant had a right not to testify. Because the law had not been clearly explained, the trial court said it would admonish the jurors that it would

20

instruct the jury to disregard the defendant's decision not to testify and ask whether they would still hold it against him.

The trial court individually questioned Juror 37 and three other jurors. Juror 37 responded affirmatively when asked if her husband was retired law enforcement. In response to the trial court's questions about the defendant's right not to testify, Juror 37 stated that her initial response was that she would probably testify on her own behalf. She did not think she would hold it against him but would wonder why he did not testify. The trial court then admonished her that a defendant could not be compelled to testify, that he had the right to protect himself from self-incrimination, and the Commonwealth had the burden of proof. After being provided this information, Juror 37 said she would not hold it against him and could decide solely based on the law.

Defense counsel asked Juror 37 how long her husband had worked in law enforcement, and she said his entire career. Counsel then asked whether she would still hold not testifying against the defendant after hearing the information provided by the trial court. Juror 37 responded that she would not. Despite her initial reaction that she would testify on her own behalf, after thinking it through, she understood there were reasons the defendant would not testify. She said she hoped that all her questions would be answered throughout the trial and that she would not wonder why he did not testify. Additionally, Juror 37 stated she had a doctor's appointment the next morning that could be rescheduled if necessary.

21

Defense counsel moved to strike Juror 37 for cause because she would still have questions about Gordon not testifying. The trial court said that Juror 37 redeemed herself because she said that she would have questions about everything throughout the trial, and when she initially responded, she did not know the defendant had a right not to testify and against self-incrimination. The trial court ruled that it would leave Juror 37 on the panel. The trial court struck Jurors 45, 23, and 34 because they unequivocally stated that they would hold it against Gordon if he did not testify.

There is no dispute that Gordon preserved this issue by using "a peremptory challenge to remove the complained-of juror," which must be shown on his strike sheet and identifying "on his strike sheet any additional jurors he would have struck." *Ward v. Commonwealth*, 587 S.W.3d 312, 326-27 (Ky. 2019). Gordon used a peremptory strike to remove Juror 37 from the jury pool. He also indicated which jurors he would have struck in her place, including Juror 43 who remained on the jury.

We review a "trial court's decision on whether to strike a juror for cause . . . for abuse of discretion" based on "the prospective juror's responses" and "the totality of the circumstances." *Id.* at 328. We note that "[d]enial of a defendant's right to an impartial jury is a structural error," so "harmless error analysis is not appropriate, and prejudice is presumed." *Id.* at 327. The determinative factor "in ruling on a challenge for cause" is the "*probability* of bias or prejudice that is determinative in ruling on a challenge for cause," which the trial court must weigh "based on the entirety of the juror's responses

22

and demeanor. *There is no 'magical question' that can rehabilitate a juror as impartiality is not a technical question but a state of mind."* *Id.* at 328.

In *Hubers v. Commonwealth,* 617 S.W.3d 750 (Ky. 2020), "[d]efense counsel posed a hypothetical in which [the appellant] chose not to testify and" a potential juror "said she would not change her vote based on that decision but would think about the fact that [the appellant] chose not to testify." *Id.* at 772. After counsel told her that the trial court "would give her instructions at the end of the case," counsel asked whether it was still something she would think about. *Id.* Upon further questioning, "she said she would be able to set it aside and would not hold it against" the appellant. *Id.* The potential juror "then clarified that just because she might think about it, that did not mean that it would influence her decision." *Id.* She stated "that she would be able to listen to the trial court's instructions and base her decision on those instructions, not her own beliefs.'" *Id.*

This Court determined that "[t]his juror's statement about wanting to 'hear from' Hubers and her admission that she would 'think about' [the appellant's] hypothetical choice not to testify were insufficient to warrant removal when considering the totality of her responses." *Id.* at 772-73. This Court held that although the trial court did not explain to the juror that the appellant had the right not to testify, the "trial court did not abuse its discretion in declining to strike her for cause" because "the juror clearly indicated that she could follow the court's instructions." *Id.* at 773.

23

Here, the trial court's denial of striking Juror 37 for cause was based on the totality of the circumstances, not a single answer to some magic question. Before any discussion of Gordon's decision not to testify, defense counsel posed the hypothetical that if someone were charged with murder, they would want to testify on their behalf and asked Juror 37 whether she would if she were on trial for murder. After counsel inadequately explained the law, Juror 37 indicated that she would not hold it against him but would still wonder why he did not testify. Counsel's hypothetical is analogous to the one posed in *Hubers*, and without a prior explanation of the law, it invited Juror 37's response.

Unlike *Hubers*, the trial court clarified the law by explaining to Juror 37 that Gordon had the right not to testify. Juror 37 had "the benefit of the trial court's guidance regarding [Gordon's] Fifth Amendment right to not testify." After hearing a clear explanation of the law, Juror 37 responded that she would follow the court's instructions and would not hold the defendant's choice not to testify against him. Based on the entirety of Juror 37's responses and the totality of the circumstances, the trial court did not abuse its discretion in denying Gordon's for cause strike.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the Jefferson Circuit Court.

All sitting. Lambert, C.J.; Bisig, Conley, Goodwine, Keller, and Nickell, JJ., concur. Thompson, J., concurs in result only.

24

COUNSEL FOR APPELLANT:

Shannon Dupree
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Stephanie L. McKeehan
Assistant Attorney General